IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | |
|---|---|
| PHILLIS WINCKLER,<br>　　　　Plaintiff, | )<br>)<br>) |
| v. | )　　CIVIL NO. 3:11-cv-782-DJN<br>) |
| MICHAEL J. ASTRUE,<br>　　Commissioner of Social Security,<br>　　Defendant. | )<br>)<br>)<br>) |

## MEMORANDUM OPINION

Phillis Winckler ("Plaintiff") is 54 years old and previously worked as a cook. On March

24, 2009, Plaintiff protectively applied for Supplemental Security Income ("SSI") and Disability

Insurance Benefits ("DIB") under the Social Security Act (the "Act") with an amended alleged

onset date of September 9, 2008, alleging disability due to rheumatoid arthritis and back, leg and

shoulder problems. Plaintiff's claim was presented to an administrative law judge ("ALJ"), who

denied Plaintiff's request for benefits. The Appeals Council subsequently denied Plaintiff's

request for review on September 21, 2011.

Plaintiff now challenges the ALJ's denial of benefits, arguing that the ALJ improperly

discredited the opinion of a one-time consultative physician. (Pl.'s Mem. in Supp. of Mot. for

Summ. J. ("Pl.'s Mem.") at 21.) Plaintiff further asserts that, once the consultative physician's

opinion is afforded weight, she will be entitled to benefits under the Medical Vocational

Guidelines. (Pl.'s Mem. at 30.) In his decision, the ALJ rejected the physician's opinion,

because it was not supported by the record and — according to Plaintiff — the physician

performed a cursory examination on her. (R. at 22.)

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). This matter is now before the Court by consent of the parties pursuant to 28 U.S.C. § 636(c)(1) on Plaintiff's motion for summary judgment and motion to remand (ECF Nos. 9 & 10) and Defendant's motion for summary judgment (ECF No. 13).[1] For the reasons set forth herein, the Court GRANTS Defendant's motion for summary judgment (ECF No. 13), Plaintiff's motion for summary judgment and motion to remand (ECF Nos. 9 & 10) are DENIED, and the final decision of the Commissioner is AFFIRMED.

## I. MEDICAL HISTORY

Plaintiff only objects to the ALJ's assignment of weight to a consultative physician who conducted a physical examination. As a result, Plaintiff's education and work history, medical records, opinion evidence of examining and non-treating physicians and Plaintiff's statements are summarized below.

**A.      Plaintiff's Education and Work History**

Plaintiff completed her General Educational Development ("GED") in 1997. (R. at 210.) She began working as a cook in 1979 and stopped in 2008. (R. at 203.)

**B.      Plaintiff's Medical Records**

On February 15, 2008, Plaintiff visited the emergency room at Virginia Commonwealth University Health System ("VCU") for a muscle strain in her left thigh. (R. at 306.) She was prescribed Valium and ibuprofen. (R. at 308.) A few days later, Plaintiff visited the emergency

---

[1] The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

room again, complaining of pain in her left hamstring as a result of falling and "[doing] the splits." (R. at 328.) Plaintiff had a normal gait and grossly normal extremities, except for her swollen and tender left hamstring. (R. at 328.) Plaintiff was diagnosed with an acute myofascial strain and given Vicodin for the pain. (R. at 329.) She visited the emergency room at VCU for foot pain on March 13, 2008. (R. at 302.) Her pain level at discharge was a two out of 10. (R. at 303.)

In April 2008, Plaintiff visited the VCU complaining of left leg, hip and foot pain after a fall in February. (R. at 287.) Plaintiff was diagnosed with possible sciatica and referred to physical therapy. (R. at 288.) X-rays of Plaintiff's hips dated April 8, 2008, revealed no evidence of fracture or dislocation, no significant degenerative or erosive changes and an unremarkable right hip. (R. at 292.) Similarly, a diagnosed report of an x-ray of Plaintiff's lumbar spine observed a normal spine, mild marginal osteophyte formation at L3, L4 and L5 and unremarkable joints. (R. at 293.) A month later, Plaintiff complained that her left leg burned and tingled since her fall. (R. at 285.) She reported that she felt better with Flexeril and that ibuprofen minimally helped ease her pain. (R. at 285.)

On May 12, 2008, Plaintiff began physical therapy. (R. at 299.) She recounted her slip and fall, which affected her left leg. (R. at 299.) Plaintiff stated that her symptoms were worsening and rated her pain at an eight out of 10 in her left hip and lower back, along with a five out of 10 in her left foot. (R. at 299-300.) She ambulated with a cane and an antalgic gait and had a minimal loss of flexion, moderate loss of extension and major loss in side gliding in her lumbar spine. (R. at 300.) Plaintiff was assessed at having high pain ratings, decreased range of motion and fair potential in improving during rehabilitation. (R. at 300.)

On July 7, 2008, Plaintiff visited the physical therapist. (R. at 324.) Plaintiff was observed ambulating without an assistive device and was determined to have a good rehabilitation potential. (R. at 324.) The patient notes recounted Plaintiff's slip and fall, difficulty sleeping, performing household chores, sitting, working and participating in recreational activities. (R. at 325.) Plaintiff rated her pain in her left ankle and right hip as a four out of 10. (R. at 325.) The therapist also documented 3/5 extensions. (R. at 325.)

Plaintiff visited an orthopedic physician at CMH Orthopedic Service, LLC ("CMH") on July 17, 2008, complaining of pain in her right shoulder, right knee and left hip. (R. at 318-19.) Plaintiff was observed as being in a moderate degree of discomfort and rated her pain at an eight on a scale to 10. (R. at 318.) She had tenderness and pain while attempting flexion, abduction and external rotation. (R. at 318.) Plaintiff's right knee was swollen. (R. at 318.) X-rays of her right shoulder, right ankle and left hip revealed arthritis. (R. at 318-19.) The report also documented right knee chondromalacia patellae. (R. at 319.) Plaintiff received an injection in her right knee. (R. at 319.)

Plaintiff returned to CMH on September 11, 2008, complaining of pain in her left hip, left leg, right shoulder and right knee. (R. at 317.) Plaintiff reported that she was having a "bad day." (R. at 317.) She had tenderness in her right shoulder, muscle spasms in her neck and crepitus on range of motion in her right knee. (R. at 317.) Plaintiff was prescribed Arthrotec, Flexeril and Ultram. (R. at 317.) A few weeks later, Plaintiff returned with back complaints. (R. at 315.) Plaintiff had tenderness and a muscle spasm in her lower back with pain on range of motion. (R. at 315.) Instead of Flexeril and Arthrotec, Plaintiff was placed on Robaxin and Daypro. (R. at 315.)

A discharge summary from physical therapy dated October 5, 2008, documented 3/5 extensions, tenderness in the left hamstrings, lower leg and ankle. (R. at 323.) Plaintiff could ambulate independently and had mild pain while performing activities of daily living ("ADLs"). (R. at 322.) The therapist documented that Plaintiff had made progress — her pain decreased to a rating of a one out of 10 and her soft tissue inflammation was reduced by 50 percent in two weeks. (R. at 323.)

An x-ray of Plaintiff's C-spine dated June 5, 2009, revealed mild to moderate degenerative disease at the C4-C5 level and C5-C6 level of the cervical spine. (R. at 349.) On August 13, 2009, Plaintiff visited the emergency room, complaining of pain and spasms in her lower back down her left leg and requesting more pain medications. (R. at 344.) Plaintiff had a decreased range of motion, swelling, tenderness and warmth in her extremities. (R. at 344.) She rated her pain at an eight out of 10. (R. at 344.) Plaintiff was diagnosed with chronic back pain and given Vicodin. (R. at 345.)

Plaintiff went to the emergency room on March 2, 2010, complaining of pain in her left side. (R. at 412.) An examination revealed no evidence of focal tenderness or deformity with full range of motion and no evidence of weakness. (R. at 412.). Plaintiff was diagnosed with back pain with sciatica and discharged with medication. (R. at 413.)

Plaintiff visited CMH on March 5, 2010, complaining of pain radiating from her left buttock to her ankle. (R. at 366.) She also reported that her hamstrings were tight. (R. at 366.) Plaintiff had 5/5 strength bilaterally and an area of focal pain in her legs. (R. at 366.) An x-ray of the lumbar spine revealed osteophytes at the L4 vertebra, no marked disc space narrowing and left sided sciatica. (R. at 366.) Plaintiff was recommended to continue with rehabilitation. (R. at 366.)

On April 27, 2010, Plaintiff visited the emergency room, stating that she twisted her left knee and had pain. (R. at 409.) Her knee was swollen, but x-rays revealed a normal left knee. (R. at 409, 411.) Pain also radiated in her back when she moved. (R. at 409.) Plaintiff was diagnosed with knee and leg sprain and prescribed ibuprofen. (R. at 410.)

Plaintiff was presented as a new patient at the Boydton Medical Center ("Boydton") on June 1, 2010. (R. at 11.) She discussed the pain that she had in her left knee and back. (R. at 374.) Plaintiff explained that she had been referred to pain management for her left knee, but her insurance did not cover it, and that she tested positive for rheumatoid arthritis, but had never received treatment. (R. at 374.) Patient notes reflected that Plaintiff's back was diffusely tender over the entire length of the spine, both sacroiliac joints and paraspinus muscles; possible fibromyalgia with trigger points was noted. (R. at 374-75.) Plaintiff's knees had crepitus and her left ankle was mildly tender, but not swollen. (R. at 375.) Plaintiff was prescribed ibuprofen and Robaxin. (R. at 375.)

Two months later, Plaintiff returned and complained of pain in her back, neck, legs, arms and chest wall. (R. at 372.) She indicated that she had muscle spasms and pain. (R. at 372.) Patient notes indicated possible fibromyalgia. (R. at 372.) Plaintiff was assessed with back pain and myalgia and mytositis, not otherwise specified. (R. at 373.) Plaintiff visited the emergency room in August 2010, complaining of muscle spasms in her legs and back and rating her pain at an eight out of 10. (R. at 403.) Plaintiff's medical history included a reference to fibromyalgia. (R. at 403.) There was no evidence of focal tenderness or deformity in her extremities and she had a full range of motion. (R. at 403.) Plaintiff was diagnosed with muscle spasms and prescribed Diazepam. (R. at 404.)

On September 3, 2010, Plaintiff visited Boydton and stated that she continued to have muscle spasms that were especially painful in her feet and legs. (R. at 370.) She indicated that Cymbalta helped with her myofascial tenderness. (R. at 370.) Plaintiff's tender points were along her spine and around her left shoulder, but she had no gross motor or sensory deficits. (R. at 370.) A few weeks later, Plaintiff returned and complained of pain in her hands, right shoulder blade, knees and feet, muscle cramps and a cold and tingling right ankle. (R. at 397.) Although Plaintiff looked uncomfortable, she had no motor or sensory deficits and 5/5 muscle strength throughout. (R. at 397.)

On October 7, 2010, Plaintiff visited the emergency room for pain rated at 10 out of 10 in her left ankle. (R. at 400.) An x-ray of her left ankle revealed no evidence of a fracture or malalignment of bones. (R. at 402.) However, there was minimal osteoarthritis and mild soft tissue swelling. (R. at 402.) Plaintiff was diagnosed with gout and discharged with Colchicine. (R. at 401.)

A few weeks later, Plaintiff visited Boydton for sharp, severe left ankle pain as well as cramps and spasms in her legs. (R. at 394.) She also reported that her left ankle gave out on her. (R. at 394.) Plaintiff stated that she visited a neurologist. (R. at 394.) Plaintiff had a decreased range of motion in her left ankle and tenderness in her ankle and legs. (R. at 394.) She was told that she needed to consult an orthopedist, a neurologist and possibly a pain management specialist. (R. at 394.)

On November 4, 2010, Plaintiff had an MRI of her cervical spine without contrast performed. (R. at 414.) The MRI revealed disc herniation with cord compression at the C4-C5 and C5-C6 levels. (R. at 414.) Plaintiff also had mild degenerative disc disease and mild spondylosis at the C4-C5 level. (R. at 414.) An MRI of Plaintiff's lumbar spine without contrast

revealed degenerative disc disease with no evidence of spinal stenosis or disc herniation. (R. at 415.)

**B.    Opinion Evidence of Ericka Young, D.O., Consulting Physician**

On June 29, 2009, Plaintiff visited Ericka Young, D.O., for a consultative examination. (R. at 332-35.) Dr. Young summarized Plaintiff's history of left leg pain, hypertension, eczema, mild degenerative joint disease of the L5, glucose intolerance, right knee arthritis and surgery on her right ankle. (R. at 332.) She documented Plaintiff's right ankle injury, surgery and pain, right shoulder blade injury, pain and physical therapy, as well as a leg injury from a slip and fall. (R. at 332.)

Dr. Young noted that Plaintiff could not perform any yard work, but could perform light cooking, cleaning and basic ADLs. (R. at 333.) Plaintiff took Flexeril, Arthrotec and over-the-counter medications. (R. at 333.) Dr. Young indicated that Plaintiff was positive for arthralgias. (R. at 333.) She observed that Plaintiff had an abnormal gait that was waddle-like with a limp concentrated to the left. (R. at 333.) Dr. Young wrote that Plaintiff's abdomen was soft, was neither tender nor distended and contained positive bowel sounds. (R. at 333.)

Plaintiff could not walk on her toes or heels or hop. (R. at 334.) Plaintiff was unable to stand on one foot at a time and had an abnormal station when standing. (R. at 334.) Plaintiff's straight leg raise test was positive bilaterally; Dr. Young noted a bilateral spasm on the cervical and thoracic spine. (R. at 334.) Plaintiff's muscle strength in her arms was 5/5 bilaterally with a 5/5 manual dexterity. (R. at 335.) Dr. Young observed that Plaintiff could open a bottle of water without any problems. (R. at 335.) The muscle strength in Plaintiff's legs was 4/5 bilaterally. (R. at 335.) Plaintiff's reflexes were intact.

Dr. Young diagnosed Plaintiff with right ankle pain (post-reconstruction), shoulder pain, hypertension, degenerative disk disease, glucose intolerance, depression and leg pain. (R. at 335.) She opined that Plaintiff could stand or walk for four hours in an eight-hour day, although she might need to take multiple breaks to sit and rest and should use a cane at all times. (R. at 335.) Dr. Young determined that Plaintiff could frequently carry less than 10 pounds and occasionally carry up to 20 pounds, "which would place her on light duty." (R. at 335.) She also opined that Plaintiff was limited with bending, stooping, crouching and reaching overhead. (R. at 335.) Plaintiff's restrictions were based on her back and knee problems. (R. at 335.)

## C.    Opinion Evidence of Non-treating State Agency Physicians

On July 23, 2009, James Wickham, M.D., a non-treating state agency physician, completed an RFC Analysis. (R. at 71-72.) Dr. Wickham opined that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for six hours in an eight-hour workday and sit for six hours in an eight-hour work day. (R. at 71.) She had no limitations pushing, pulling, handling, fingering or feeling. (R. at 71-72.) Plaintiff could occasionally climb stairs, stoop, kneel, crouch and crawl, never climb ladders and balance frequently. (R. at 72.) Additionally, Plaintiff was limited with reaching with her right arm. (R. at 72.)

Dr. Wickham commented on Dr. Young's opinions, noting that she relied "heavily on the subjective report of symptoms and limitations" provided by Plaintiff. (R. at 73.) He indicated that the opinion was without substantial support in the record and that it was merely "a snapshot" and "an overestimate" of Plaintiff's functioning. (R. at 73.) Non-treating state agency physician David C. Williams, M.D., completed a RFC Analysis on December 3, 2009, and agreed with Dr. Wickham's opinions and comments. (R. at 99-101.)

**D.    Plaintiff's Statements**

On March 24, 2009, a Social Security Administration ("SSA") employee observed that Plaintiff needed to move around and stand up during her interview and that Plaintiff would groan when she moved. (R. at 199.) Plaintiff completed a Function Report on April 8, 2009. (R. at 226-33.) Plaintiff marked that she lived in a house with family. (R. at 226.) She took baths, performed some housework, walked outside, cooked, watched television and talked on the phone daily. (R. at 226.) Plaintiff did not take care of anyone other than herself, had no problem caring for herself, but had problems sleeping. (R. at 227.) She indicated that she could not stand for long periods of time and had problems gripping jars. (R. at 228.) Plaintiff could drive alone and go shopping. (R. at 229.)

Plaintiff complained that she could not cook for herself or others anymore. (R. at 230.) She marked that she was limited in lifting, walking, stair climbing, squatting, sitting, bending, kneeling, using her hands, standing and reaching. (R. at 231.) Plaintiff indicated that she could lift 10-15 pounds, stand less than an hour, sit for about 40 minutes and walk about a quarter of a mile. (R. at 231.) She marked that she used a cane. (R. at 232.)

In a Pain Questionnaire dated April 8, 2009, Plaintiff wrote that she had pain in her right side, including her right neck, shoulder, arm, hand, back, leg, hip, ankle, knee and foot. (R. at 234-35.) Plaintiff's left hand, leg and hamstring was also in pain. (R. at 234.) She indicated that her pain lasted all day every day and occurred when she walked, reached or bent the "wrong way" or when she stood or sat for long periods of time. (R. at 234.) Plaintiff classified her pain as cramping, tingling, spasming, burning and aching. (R. at 234.)

The SSA received a letter from Plaintiff on October 6, 2009, documenting her visit with Dr. Young. (R. at 236.) Plaintiff complained that Dr. Young had not performed a physical

exam. (R. at 236.) Instead, Plaintiff asserted that Dr. Young only talked with her and that Dr. Young "got up one time and touch[ed] the left side" of Plaintiff's back. (R. at 236.) Plaintiff insisted that, if Dr. Young had performed a physical exam of the right size of her body, then Dr. Young would have learned the intensity of her injuries. (R. at 236.) Continuing, Plaintiff asserted that her examination with Dr. Young "was just a waste of [her] time" and a waste of the SSA's money. (R. at 236.) Plaintiff requested another exam. (R. at 236.)

On November 9, 2010, Plaintiff appeared before the ALJ. (R. at 31-61.) She testified that she lived with her 74-year-old mother. (R. at 50.) Her mother was a cook at the local jail. (R. at 50.) Plaintiff tried to help with household chores. (R. at 52.) She could prepare her meals, launder and clean a little. (R. at 52.)

Plaintiff testified that she stopped working in 2008, because she had an injury in her back, surgery on her right ankle and an injured left leg from a fall. (R. at 41.) Plaintiff's right side was in constant pain with muscle cramps and spasms. (R. at 43.) Physical therapy, surgery and injections did not help ease her pain. (R. at 44.)

Plaintiff stated that she was prescribed a cane for ambulation around August 2010. (R. at 41, 49.) Plaintiff took medication for her pain and chronic bronchitis. (R. at 42-43.) She also took Cymbalta, which helped with her anxiety and possible fibromyalgia. (R. at 45-46.) She indicated that she had problems bending, crouching, stooping, reaching with both hands and walking. (R. at 43, 44-45.) Plaintiff testified that she could not walk a city block or half a city block and that she used a cane, because her "ankles want[ed] to give out" otherwise. (R. at 44.) While she had fallen as a result of her ankles "giving out," she had never hit the floor. (R. at 45.) Plaintiff's past jobs required standing, lifting and bending. (R. at 45.)

## II. PROCEDURAL HISTORY

Plaintiff protectively filed for DIB and SSI on March 24, 2009, claiming disability due to rheumatoid arthritis and back, leg and shoulder problems with an alleged onset date amended to September 9, 2008. (R. at 64, 179, 186.) The SSA denied Plaintiff's claims initially and on reconsideration.[2] (R. at 117-22, 124-28.) On November 9, 2010, Plaintiff appeared and testified before an ALJ. (R. at 29-61.) On March 21, 2011, the ALJ issued a decision finding that Plaintiff was not under a disability, as defined by the Act. (R. at 9-23.) The Appeals Council subsequently denied Plaintiff's request to review the ALJ's decision on September 21, 2011, making the ALJ's decision the final decision of the Commissioner and subject to judicial review by this Court. (*See* R. at 1-3.)

## III. QUESTION PRESENTED

Was the Commissioner's assignment of weight to a consultative physician supported by substantial evidence on the record and the application of the correct legal standard?

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. Jan. 5, 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a

---

[2] Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services ("DDS"), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA. 20 C.F.R. pt. 404, subpt. Q; *see also* § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

conclusion. *Id.* (citations omitted); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (citation omitted) (internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) (internal quotation marks omitted)). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted). While the standard is high, if the ALJ's determination is not supported by substantial evidence on the record, or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record. *See Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity"

("SGA").[3] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to her past relevant work[4] based on an assessment of the claimant's residual functional capacity ("RFC")[5] and the "physical and mental demands of

---

[3] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

[4] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[5] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from performing her past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry his burden in the final step with the testimony of a vocational expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents *all* of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

---

SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

## V. ANALYSIS

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since September 9, 2008. (R. at 11.) At step two, the ALJ determined that Plaintiff was severely impaired from obesity, osteoarthritis in the right shoulder and lower joints, a back disorder and possible fibromyalgia. (R. at 11.) At step three, the ALJ concluded that Plaintiff's maladies did not meet one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (R. at 13-14.)

Next, the ALJ determined that Plaintiff had the RFC to perform light work, except that she may not climb ladders, ropes or scaffolds and may occasionally perform other postural activities (climbing stairs or ramps, balancing, stooping, kneeling, crouching and crawling) with occasional overhead reaching. (R. at 14.) In doing so, the ALJ noted that Plaintiff testified that she could no longer work due to her impairments, including an injury to her back, surgery on her right ankle and a torn ligament in her left leg. (R. at 15.) Plaintiff complained that she had pain, daily swelling, muscle spasms and cramps in her leg. (R. at 15.)

The ALJ documented Plaintiff's claims of chronic bronchitis, severe back pain that radiated from her shoulder blades to her legs, inability to lift her right arm, problems sleeping, bending and squatting. (R. at 15.) Plaintiff also testified that she could not walk a city block and needed the assistance of a cane, so her ankle would not give out. (R. at 15.) She lived with her mother and stopped working after she slipped and fell. (R. at 15.) Plaintiff attempted to perform chores, could cook for herself and could launder some, but had to pace herself. (R. at 16.) The ALJ found that Plaintiff was not entirely credible "in light of the longitudinal record as a whole." (R. at 16.)

The ALJ then summarized Plaintiff's medical records. (R. at 16-21.) Plaintiff was diagnosed with acute muscle strain/pull on her left hamstring, a mild marginal osteophyte

16

formation in her lumbar spine, unremarkable hips, minimal arthritis in her shoulders and arthritis in her right ankle and knee. (R. at 16.) Plaintiff indicated that physical therapy helped ease her pain; she was discharged from physical therapy after three months. (R. at 16-17.)

X-rays of Plaintiff's cervical spine revealed mild to moderate degenerate disc disease at C4-C5 and C5-C6. (R. at 17.) Plaintiff also visited Dr. Young for a consultative examination, during which Dr. Young diagnosed Plaintiff with right ankle pain, shoulder pain, hypertension, degenerative disk disease, glucose intolerance, depression and leg pain. (R. at 17.) The ALJ highlighted that the doctor indicated that she reviewed Plaintiff's medical records, but did not indicate, reference or include those records with the report. (R. at 17.) Dr. Young opined that Plaintiff could stand or walk for four hours in an eight-hour workday, should use a cane to walk and could frequently carry less than 10 pounds as well as occasionally carry up to 20 pounds. (R. at 17.) Dr. Young observed that Plaintiff was limited by her back and knee problems. (R. at 17.) The doctor further opined that Plaintiff had significant postural limitations with bending, stooping, crouching and reaching overhead. (R. at 17.) The ALJ also noted that a letter from Plaintiff protested Dr. Young's examination, because the doctor's assessment was based on a conversation, observation and one touch. (R. at 17.)

The ALJ then summarized opinion evidence from the non-treating physicians, who determined that Plaintiff had the RFC to perform work at the light exertional level, except that she could not climb ladders, ropes or scaffolds, could frequently balance, could occasionally kneel, bend, stoop, crouch or crawl, and had limited reaching abilities. (R. at 17-18.) The physicians also disagreed with Dr. Young's opinions, because she relied on Plaintiff's subjective symptoms and ignored the totality of the evidence, which did not support Plaintiff's subjective complaints. (R. at 18-19.)

Additional medical records revealed that Plaintiff's back was normal and physical examinations were within normal limits, despite complaints of low back pain. (R. at 18-19.) Plaintiff was referred to pain management for her knee pain, despite normal x-rays of her left knee. (R. at 19.) Plaintiff screened negative for rheumatoid arthritis. (R. at 19.) In 2010, Plaintiff was assessed with possible fibromyalgia. (R. at 20.)

The ALJ determined that Plaintiff's medical records did not support her alleged symptoms. (R. at 21.) More specifically, the x-rays did not contain evidence of Plaintiff's subjective symptoms and Plaintiff's treatment had been generally routine or conservative. (R. at 21.) The ALJ noted that Plaintiff made inconsistent statements and was not credible. (R. at 21.) Further, the ALJ rejected Dr. Young's opinion, because it was not supported by the record and because Dr. Young performed a cursory examination on Plaintiff. (R. at 21.) Moreover, Dr. Young's report was based on Plaintiff's subjective symptoms, not objective findings. (R. at 21.) Continuing, the ALJ adopted the opinions of the non-treating physicians, because they were consistent with the record. (R. at 22.)

At step four, the ALJ assessed that Plaintiff was not able to perform any past relevant work. (R. at 22.) Next, considering Plaintiff's approaching advanced age, high school-equivalent education, ability to communicate in English, work experience and RFC, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (R. at 22-23.) The ALJ therefore found that Plaintiff had not been under a disability under the Act since September 9, 2008. (R. at 23.)

Plaintiff argues that the ALJ erred when he disregarded Dr. Young's opinion and instead relied on the non-treating state agency physicians' opinions. (Pl.'s Mem. at 21.) During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable

severe impairment or combination of impairments which would significantly limit the claimant's

physical or mental ability to do basic work activities, the ALJ must analyze the claimant's

medical records that are provided and any medical evidence resulting from consultative

examinations or medical expert evaluation that have been ordered. *See* 20 C.F.R. § 416.912(f).

When the record contains a number of different medical opinions, including those from the

Plaintiff's treating physicians, consultative examiners or other sources that are consistent with

each other, then the ALJ makes a determination based on that evidence. *See* 20 C.F.R. §

416.927(c)(2). If, however, the medical opinions are inconsistent internally with each other or

other evidence, the ALJ must evaluate the opinions and assign them respective weight to

properly analyze the evidence involved. 20 C.F.R. §§ 416.927(c)(2), (d).

If a medical opinion is not from a treating physician and assigned controlling weight by

the ALJ, then the ALJ assesses the weight of the opinion by considering: (1) the length of the

treatment relationship and the frequency of examinations; (2) the nature and extent of the

treatment relationship, including the treatment provided and the kind of examination or testing

performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4)

consistency between the opinion and the record as a whole; (5) whether or not the physician is a

specialist in the area which an opinion is rendered; and (6) other factors brought to the

Commissioner's attention which tend to support or contradict the opinion. 20 C.F.R. §

404.1527(d)(2)-(6); *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006).

As Dr. Young is an osteopathic doctor, she is a specialist in the area in which her opinion

was rendered and, therefore, favored by factor five. *See Hines*, 453 F.3d at 563. Moreover,

Plaintiff explains that the non-treating state agency physicians never examined her, but Dr.

Young did. (Pl.'s Mem. at 22-25.) While it is true that none of the physicians saw Plaintiff more

19

than once, Plaintiff only visited Dr. Young. However, under the second factor from *Hines*, "the kind of examination or testing performed" must be evaluated. *Hines*, 453 F.3d at 563.

Plaintiff now furiously argues that Dr. Young performed a thorough examination of her, despite complaining in a letter to the SSA after her visit with Dr. Young that Dr. Young only "got up one time and touch[ed] the left side" of Plaintiff's back and that the examination "was just a waste of [her] time" and a waste of the SSA's money. (R. at 236.) While Dr. Young's report included test results, (*see* R. at 334), it also contained a significant amount of subjective evidence (*see* R. at 332-33). Regardless, a contemporaneous statement from Plaintiff explicitly asserted that she was not thoroughly examined by Dr. Young. (R. at 236.) As a result, the first and second factors do not favor Dr. Young's opinion over the opinions of the non-treating physicians.

The third and fourth factors — the degree to which the physician's opinion is supported by relevant evidence and consistency between the opinion and the record as a whole — favor the opinions of the non-treating state agency physicians over Dr. Young's opinion. Plaintiff concedes that her complaints of back, ankle and leg pain are subjective evidence that support Dr. Young's opinion. (Pl.'s Mem. at 25.) However, she argues that her physicians also observed muscle spasms, swelling and crepitus. (Pl.'s Mem. at 25-26, 28-29.) Plaintiff further contends that the x-ray and MRI reports objectively support Dr. Young's opinion. (Pl.'s Mem. at 27-28.)

While the physicians did observe muscle spasms, swelling and crepitus, Plaintiff's treatments were relatively conservative. For example, on July 17, 2008, she received injections for her swollen right knee. (R. at 319.) A few months later, Plaintiff was prescribed Arthrotec, Flexeril and Ultram after the physician observed muscle spasms in her neck. (R. at 315, 317.)

Similarly, Plaintiff was proscribed Vicodin after she was observed with swelling, complaining of high levels of pain and diagnosed with chronic back pain. (R. at 345.)

On April 27, 2010, Plaintiff stated that she twisted her left knee, which was swollen. (R. at 409.) However, x-rays of the knee were unremarkable. (R. at 411.) A few months later, an x-ray again revealed a normal left knee, but her physician observed crepitus in the knee. (R. at 375.) Plaintiff was prescribed ibuprofen and Robaxin. (R. at 375.) While Plaintiff was diagnosed with muscle spasms and prescribed Diazepam in August 2010, she had a full range of motion in her extremities. (R. at 403.) In September 2010, Plaintiff had no motor or sensory deficits and 5/5 muscle strength throughout her extremities. (R. at 370, 397.)

Additionally, once Plaintiff completed physical therapy, she could ambulate without a cane and rated her pain at a one out of 10. (R. at 323.) Plaintiff had made progress. (R. at 323.) Her soft tissue inflammation was reduced by 50 percent in two weeks. (R. at 323.)

Radiological evidence routinely revealed normal or unremarkable joints. (*See* R. at 292, 293.) While an x-ray of Plaintiff's C-spine dated June 5, 2009, exposed mild to moderate degenerative disc disease, (R. at 349), an x-ray of Plaintiff's lumbar spine dated March 5, 2010, discovered osteophytes at the L4 vertebra (R. at 366). An x-ray of her left ankle dated October 7, 2010, revealed only minimal osteoarthritis and mild soft tissue swelling; Plaintiff was diagnosed with gout. (R. at 401-02.) MRI reports of Plaintiff's cervical and lumbar spine from November 2, 2010 noted disc herniation with cord compression, mild degenerative disc disease and mild spondylosis. (R. at 414-15.)

Plaintiff's medical evidence documented conservative treatments through pain medication and physical therapy. Objective radiological evidence revealed mild or minimal degenerative disc disease and osteoarthritis. The objective medical evidence supported the

opinions of the non-treating state agency physicians, while Plaintiff's subjective complaints supported Dr. Young's opinion. As such, factors three and four weigh more heavily towards the opinions of the non-treating state agency physicians.

The ALJ's rejection of Dr. Young's opinion was supported by the objective medical evidence and Plaintiff's letter to SSA.[6] The ALJ therefore did not err when he assigned weight to the physicians' opinions. As such, the decision of the Commissioner is affirmed.

## VI. CONCLUSION

For the reasons set forth herein, the Court GRANTS Defendant's motion for summary judgment (ECF No. 13) and DENIES Plaintiff's motion for summary judgment and motion to remand (ECF Nos. 9 & 10). The final decision of the Commissioner is hereby AFFIRMED.

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Dated: September 28, 2012

---

[6] Because the Court finds that the ALJ did not err in rejecting the opinion of Dr. Young, it need not reach Plaintiff's second issue pertaining to the Medical Vocational Guidelines.